# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

MICHAEL J MOCKERIDGE and
SUSAN J MOCKERIDGE,

              *Plaintiffs,*

*v.*

HARRY HARVEY, COUNTY OF
ALCONA, KENNETH GIBSON,
KEITH KRENTZ, TOWNSHIP OF
CALEDONIA, and DAVID
SCHMIDT,

              *Defendants.*

_____/

CASE NO. 21-cv-12896

DISTRICT JUDGE THOMAS L. LUDINGTON

MAGISTRATE JUDGE PATRICIA T. MORRIS


**REPORT AND RECOMMENDATION ON**
**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 79), DEFENDANT KEITH KRENTZ'S MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 80), DEFENDANT ALCONA COUNTY'S MOTION FOR SUMMARY JUDGMENT (ECF No. 83), DEFENDANTS HARRY HARVEY AND DAVID SCHMIDT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 85), and DEFENDANTS KEITH GIBSON AND CALDENOIA TOWNSHIP'S MOTION FOR SUMMARY JUDGMENT (ECF No. 86)[1]**

I.    **RECOMMENDATION**

For the reasons discussed below, I recommend the following:

---

[1] As Defendants' dispositive motions (ECF Nos. 80, 83, 85, and 86) are all cross referenced, interrelated, and in essence based on the same arguments raised in response to Plaintiffs' motion for partial summary judgment (ECF No. 79), the undersigned will address and provide adjudicatory recommendations on all pending dispositive motions in this Report and Recommendation.

Plaintiffs' Motion for Partial Summary Judgment (ECF No. 79) as to all parties be **DENIED**. Defendant Krentz's Motion for Partial Summary Judgment as to Plaintiff's Count V – Private Party Conspiracy claim (ECF No. 80) be **GRANTED**. Defendant Alcona County's Motion for Summary Judgment be **GRANTED** (ECF No. 83) and Plaintiffs' Count I – Procedural Due Process Violation claim, Count II – Equitable Estoppel/Vested Rights, Count III – Fourth Amendment Violation claim, and Count IV – Trespass claim be dismissed as to Defendant Alcona County. Defendants Harvey and Schmidt's Motion for Summary Judgment be **GRANTED** (ECF No. 85) and Plaintiffs' Count I – Procedural Due Process Violation claim, Count II – Equitable Estoppel/Vested Rights, Count III – Fourth Amendment Violation claim, and Count IV – Trespass claim be dismissed as to Defendants Harvey and that Counts III and IV be dismissed as to Defendant Schmidt. Defendant Keith Gibson and Caledonia Township's Motion for Summary Judgment (ECF No. 86) be **GRANTED** and Plaintiff's Count III – Fourth Amendment Violation claim and Count IV – Trespass claim be dismissed as to Defendants Gibson and Caledonia Township.

If adopted, the Court would: (1) dismiss Plaintiffs' federal claim for Procedural Due Process Violation (Count I) as to Defendants Harvey and Alcona County; (2) dismiss Plaintiffs' Equitable Estoppel/Vested Rights (Count II) as to Defendants Harvey and Alcona County; (3) dismiss Plaintiffs' federal claim for Fourth Amendment Violation (Count III) as to Defendants Harvey, Alcona County, Schmidt, Gibson, and Caledonia Township; and (4) dismiss Plaintiffs' Private Party Conspiracy (Count V) as

2

to Defendant Krentz (Count V).  The only surviving cause of action will be Plaintiffs'

Count IV – Trespass which is a state-law claim.  The undersigned recommends the

Court decline to exercise supplemental jurisdiction on this claim.

## II.  REPORT

### A. Background

Plaintiffs, Michael J. Mockeridge and Susan J. Mockeridge, purchased about

forty acres of land in Autumn 2020 for "cabining, hunting, enjoying nature, and family

gatherings."  (ECF No. 79, PageID.778; ECF No. 86, PageID.1778).  After purchasing

the property, Plaintiffs decided to install "mini-cabins" on the site as "sleeping quarters

for family members."  (ECF No. 79, PageID.778–79; ECF No. 83, PageID.1033).

Michael Mockeridge represents that before installing the mini-cabins, both he and his

son contacted Caledonia Township and Alcona County Building Department[2] to assess

what permits, if any, were required.  (ECF No. 79, PageID.778–79; ECF No. 83,

PageID.1033).  Plaintiffs purport that Kerry Scott, Office Manager and Soil Erosion

Inspector at the Alcona County Building Department (ECF No. 83-1, PageID.1119), and

---

[2] Defendants Alcona County and Harry Harvey challenge Plaintiff Michael
Mockeridge's representation that he spoke to Defendant Harvey before June 2022 about
whether permits for the mini-cabins were required.  (ECF No. 83-1, PageID.1096).  Defendant
Harvey argues in his respective summary judgment motion and his reply to Plaintiffs' partial
summary judgment motion that Mr. Mockeridge "admitted [during his deposition] that he
never spoke directly with Harvey until June 2022, *after* all five cabins were constructed. . . ."
(ECF No. 101, PageID.2476) (emphasis in original).  Plaintiffs argue in their reply to
Defendant Alcona County and Harvey's response that Mr. Mockeridge's answer was erroneous
and that Brian Mockeridge's, Plaintiffs' son, testimony supports Plaintiffs' representation that
Defendant Harvey was contacted to assess whether a permit would be needed *prior* to the
purchase of the mini-cabins.  (ECF No. 104, PageID.2717) (emphasis added).

Defendant Harvey, Alcona County Building Department Building Official, advised that permits were not required as far as Alcona County was concerned.  (ECF No. 79, PageID.779; ECF No. 83, PageID.1034–35; ECF No. 83-31, PageID.1094).  However, Scott and Defendant Harvey both deny advising Plaintiff Michael Mockeridge or his son that permits were not required if the mini-cabins were intended to be used as sleeping quarters.  (ECF No. 83, PageID.1035; ECF 83-3, PageID.1178; ECF No. 83-7, PageID.1247; ECF No. 103, PageID.2695; ECF No. 85-8, PageID.1640).  Plaintiffs proceeded to order and erect mini-cabins on their property, believing they were allowed to do so.  (ECF No. 79, PageID.779–80).  The Mockeridge family began sleeping in their respective mini-cabins in June 2021.  (ECF No. 83, PageID.1033; ECF No. 83-2, PageID.1155).  The family also erected a sign on their property which read "Key West National Forest, Mockeridge Family Campground."  (ECF No. 79-15; ECF No. 83, PageID.1035).

Plaintiffs believe that the erection of the mini-cabins annoyed some of their surrounding neighbors, especially Defendant Keith Krentz.  (ECF No. 79, PageID.780).  Plaintiffs represent that Defendant Krentz filed a complaint[3] with Caledonia Township and took it upon himself to use his local government connections to obtain their

---

[3] A total of four complaints were submitted to the Health Department by the Mockeridge's neighbors reporting concerns about the property relating to sanitation issues, fire hazards, and the operation of an unlicensed campground.  (ECF No. 85, PageID.1263; ECF No.85-8, PageID.1654; ECF No.85-10, PageID.1695).

assistance in trying to "send the [Plaintiffs] packing." (ECF No. 79, PageID.780). After filing the complaint, Defendant Krentz received an email from Defendant David Schmidt, Environmental Health Program Coordinator of District Health Department No. 2, indicating that he could not identify a basis upon which he could act based on the information included in the complaint forms. (ECF No. 79, PageID.781; ECF No. 79-9). He requested that Defendant Krentz, and the other concerned neighbors, revise their complaints and note the issues of "unlicensed campground" and "sanitation issue" in their respective forms. (ECF No. 79, PageID.781; ECF No. 79-9, PageID.821).

In furtherance of the complaints, Defendant Krentz coordinated a meeting with Defendants Harvey, Schmidt, and Kenneth Gibson[4], then Caledonia Township Zoning Administrator, (collectively, the "Government Officials") to escort them to the site so that the Government Officials could observe firsthand the concerns he and his neighbors had about the developments taking place on the Mockeridge property.[5] (ECF No. 79, PageID.782; ECF No.79-36, PageID.912; ECF No. 83, PageID.1036; ECF 85-6, PageID.1615–16). The site review took place on June 2, 2021. (ECF No. 83, PageID.1037).

---

[4] Defendant Gibson resigned from his position as Caledonia Township Zoning Administrator on June 10, 2021.

[5] Defendant Alcona County argues on that day the "intent of the visit was not to enter onto Plaintiffs' land." (ECF No. 83, PageID.1036).

On that day, Defendant Krentz drove the Government Officials up Skylar Trail to show them the Mockeridge campground sign.  (ECF 85-6, PageID.1616).  Then he turned around, drove through his family property, and—with permission—onto Curtis Miller's property to observe the mini-cabins.  (ECF No. 83, PageID.1037; ECF No. 85-6, PageID.1616).  Defendant Krentz and the Government Officials represent that there was no sign on the property prohibiting trespassing, no fence surrounding the mini-cabins, and the mini-cabins were visible from where they were standing on the Miller property.  (ECF No. 85-8, PageID.1655; ECF No. 85-9, PageID.1685; ECF No. 85-10, PageID.1708).  At the time of the site visit, the property was "unoccupied" by the Mockeridge family.  (ECF No. 83, PageID.1037).  Although the site was unoccupied, Defendant Krentz represents that his intention on June 2 was only to show the Government Officials the site from his Mr. Miller's, Defendant Krentz's godson, property and not to enter onto Plaintiffs' property.  (ECF No. 85-6, PageID.1617, 1619; ECF No. 97, PageID.2404).

While standing on the Miller property, Defendant Gibson observed that one of the mini-cabins did not appear to adhere to Defendant Caledonia Township's setback requirements.  (ECF No. 102, PageID.2500).  This prompted him to walk onto Plaintiffs' property and measure the setback from the closest mini-cabin to the property line.  (ECF No.85-9, PageID.1686; ECF No. 102, PageID.2500).  While doing so he did not enter any of the mini-cabins or look into their respective windows.  (ECF No. 102, PageID.2500).  Defendants Schmidt and Harvey also walked onto Plaintiffs' property to

6

inspect the mini-cabins and surrounding area.  (ECF No. 85, PageID.1264; ECF No. 85-10, PageID.1695, 1701).  Defendant Harvey looked into three of the mini-cabins and noticed that while there were beds and bunks inside, they were not equipped with smoke detectors.  (ECF No. 85-8, PageID.1636).  At no point did he or Defendant Schmidt use any special tool when reviewing the mini-cabins; Defendant Harvey only used a small flashlight and Defendant Schmidt took a few photos using an agency issued cellular phone.  (*Id.* at PageID.1655; ECF No.85-10, PageID.1709).  At some point during the site visit, one of the Government Officials requested Defendant Krentz "come onto Plaintiff's property and take photographs."  (ECF No. 97, PageID.2404).  Neither Defendant Krentz nor the Government Officials had a warrant or permission from Plaintiffs to enter the property on this day.  (ECF No. 79, PageID.783; ECF No. 85, PageID.1264; ECF No. 85-10, PageID.1696; ECF No. 97, PageID.2405).

Following the June 2 site visit, Defendant Harvey informed Plaintiffs that a building permit was required if individuals were going to sleep in the mini-cabins.  (ECF No. 79, PageID.785).  He visited the site again on July 14, 2021, with Defendant Krentz, and Cyndi Aspey, Caledonia Township Zoning Official and Supervisor, in attendance.  (*Id.* at PageID.786).  Some of Plaintiffs' adult children were present during this visit but Plaintiffs were not.  (*Id.* at PageID.785–86).  Defendant Harvey informed Plaintiffs' adult children that he had a "pre-drafted" stop work order in his possession and requested to inspect the mini-cabins.  (*Id.* at PageID.786).  After receiving permission from Plaintiffs' son Michael, he inspected the interior of one of the mini-

cabins. (*Id.* at PageID.786; ECF No. 85-8, PageID.1648). Once he concluded his inspection, he served the Stop Work Order.[6] (ECF No. 79, PageID.786; ECF No. 85-8, PageID.1643). He issued the Stop Work Order because, during his June 2 site visit, he noticed the mini-cabins were equipped with electricity but there were no smoke detectors. (ECF No. 85-8, PageID.1643). He noted that this presented a "clear and immediate danger." (*Id.*). He advised the Mockeridge children in attendance that he would call them in the morning but never did so. (ECF No. 79, PageID.788). Instead, he reaffirmed the issuance of the Stop Work Order via letter. (*Id.*).

On July 30, 2021, Plaintiff Michael Mockeridge decided to apply for the building permits. (*Id.*). He alleges that an Alcona County Building Department representative indicated they would issue the permits but it would include an associated penalty because Plaintiffs started working on the property before obtaining the permit. (*Id.*). Plaintiff Michael Mockeridge sought assistance from the Alcona County Board of Commissioners but the Board's ultimate decision directed him to pay the filing fee as well as the penalty. (*Id.* at PageID.788–89).

---

[6] Plaintiffs contend that the Stop Work Order was served without prior notice but Defendant Alcona County represents that Defendant Harvey spoke with Plaintiff Michael Mockeridge on July 14, 2021 to inform him that a Stop Work Order was being issued against the property. (ECF No. 83, PageID.1037; ECF No. 83-1, PageID.1108). However, Defendant Alcona County concedes that Defendant Harvey did not provide Plaintiffs with the state required 24-hour notice prior to issuing the Stop Work Order. (ECF No. 83, PageID.1038; ECF No. 83-3, PageID.1182).

On December 10, 2021, Plaintiffs commenced the instant action.  (ECF No. 1).

They filed an amended complaint[7] on January 21, 2022 and now move for summary

judgment on the following claims: Count I – Procedural Due Process Violation

(Defendants Alcona County and Harvey); Count II –  Equitable Estoppel/Vested Rights

(Defendants Alcona County and Harvey); Count III – Fourth Amendment Violations

(Defendants Harvey, Gibson, Schmidt, and Krentz); and Count IV – Trespass

(Defendants Harvey, Gibson, Schmidt, Krentz, Alcona County, and Caledonia

Township).  (ECF No. 79).

All Defendants filed cross summary judgment motions:

1. Defendant Krentz filed a Motion for Partial Summary Judgment on

   Plaintiffs' Count V – Private Party Conspiracy claim.  (ECF No. 80).

2. Defendant Alcona County filed a Motion for Summary Judgment on

   Plaintiffs' Count I – Procedural Due Process Violation claim, Count II –

---

[7] In the Amended Complaint, Plaintiffs allege the following claims: Count I –
Procedural Due Process Violation (Defendants Alcona County and Harvey); Count II –
Equitable Estoppel/Vested Rights (Defendants Alcona County and Harvey); Count III –
Fourth Amendment Violations (Defendants Harvey, Gibson, Schmidt, Alcona County, and
Caledonia Township); Count IV – Trespass (Defendants Harvey, Gibson, Schmidt, Krentz,
Alcona County, and Caledonia Township); Count V – Private Party Conspiracy (Defendant
Krentz); Count VI – Open Meetings Act Violation (Defendants Brummund, Small, Gauthier,
Thompson, & Brege); and Count VII – Open Meetings Act Violation (Defendant County of
Alcona).  (ECF No. 23, PageID.282–95).  Counts VI and VII were dismissed with prejudice on
June 27, 2022.  (ECF No. 65).  Defendants Brummund, Small, Gauthier, Thompson, and Brege
were also all dismissed from the case. (*Id.*)

Equitable Estoppel/Vested Rights claim, Count III – Fourth Amendment

Violation claim, and Count IV – Trespass claim.  (ECF No. 83).

3.  Defendants Harvey and Schmidt filed a Motion for Summary Judgment on

Plaintiffs' Count I – Procedural Due Process Violation claim, Count II –

Equitable Estoppel/Vested Rights claim, Count III – Fourth Amendment

Violation claim, and Count IV – Trespass claim.[8]  (ECF No. 85).

4.  Defendants Gibson and Caledonia Township filed a Motion for Summary

Judgment on Plaintiffs' Count III – Fourth Amendment Violation claim and

Count IV – Trespass claim.  (ECF No. 86).

### B. Summary Judgment Standard

A court will grant a party's motion for summary judgment when the movant

shows that "no genuine dispute as to any material fact" exists.  Fed. R. Civ. P. 56(a).

The moving party bears "the initial burden of showing the absence of a genuine issue of

material fact as to an essential element of the non-movant's case."  *Street v. J.C.*

*Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v.*

*Cartrett*, 477 U.S. 317, 323 (1986)) (internal quotation marks omitted).  For purposes of

a summary judgment motion, a fact is "material" where proof of that fact "would have

[the] effect of establishing or refuting one of the essential elements of a cause of action

or defense asserted by the parties.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.

---

[8] Only the arguments raised as to Counts III and IV are applicable to Defendant
Schmidt.

1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A

dispute over a material fact is genuine "if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247–48 (1986). In making its determination, a court may consider the

plausibility of the movant's evidence. *Matsushita*, 475 U.S. at 587–88.

The non-moving party cannot merely rest on the pleadings in response to a

motion for summary judgment. *Anderson*, 477 U.S. at 248. Instead, the non-moving

party has an obligation to present "significant probative evidence" to show that "there is

[more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris*

*Cos.*, 8 F.3d 335,339–40 (6th Cir. 1993). Further, the non-movant cannot withhold

evidence until trial or rely on speculative possibilities that material issues of fact will

appear later. 10b Charles Alan Wright & Arthur R. Miller, Federal Practice and

Procedure § 2739 (3d ed. 1998).

In reviewing the motion, the court must view all facts and inferences in the light

most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986). And "where the parties have filed cross-motions for

summary judgment, 'the court must evaluate each party's motion on its own merits,

taking care in each instance to draw all reasonable inferences against the party whose

motion is under consideration.'" *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir.

2016). After examining the evidence designated by the parties, the court then

determines "whether the evidence presents a sufficient disagreement to require

11

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251–52).  Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.  However, summary judgment is proper when the moving party shows that the non-moving party cannot meet its burden of proof. *Celotex*, 477 U.S. at 325.

### C. Analysis

#### I. Defendants Harvey and Schmidt's Motion for Summary Judgment (ECF No. 85)

Plaintiffs assert four claims against Defendant Harvey, in his personal capacity: Procedural Due Process Violation (Count I), Equitable Estoppel/Vested Rights (Count II), Fourth Amendment Violation (Count III), and Trespass (Count IV).  (ECF No. 23). Only Counts III and IV are asserted against Defendant Schmidt in both his personal and official capacities.  (*Id.* at PageID.272).

Defendant Harvey argues that Counts I and II should be dismissed as they fail as a matter of law.  (ECF No. 85, PageID.1260).  As to Count III, Defendants Harvey and Schmidt argue they did not violate Plaintiffs' clearly established constitutional rights and are thereby entitled to qualified immunity.  (ECF No. 85, PageID.1260–61). And as to Count IV they argue they were authorized by law to be on the property and therefore did not trespass.  (*Id.*).

### 1.  Count I – Procedural Due Process Claim

Plaintiffs argue that the legal clearance they received from Defendant Harvey and the subsequent substantial construction undertaken on the property resulted in the formation of a vested property right.  (ECF No. 79, PageID.794–95; ECF No. 98, PageID.2439).  Further, they argue that because they installed the mini-cabins in direct reliance upon the legal clearance given and the mini-cabins were built prior to issuance of the July 14, 2021 Stop Work Order their claim for recognition of "their ripened vested rights pursuant to the vest-rights doctrine cannot be dismissed as requested by Defendant Harvey."  (ECF No. 98, PageID.2440).

In light of their vested property right, Plaintiffs argue that Defendant Harvey violated their right to procedural due process by not providing them with notice and an opportunity to be heard prior to issuing the Stop Work Order as required by MCL § 125.1512(3).  (ECF No. 79, PageID.800–02; ECF No. 98, PageID.2441).  Plaintiffs also argue that the permits are no longer required as they have a vested right to continue to enjoy their property as developed.  (ECF No. 98, PageID.2444).  Based on these arguments, Plaintiffs argue they are entitled to summary judgment on Count I and that the Stop Work Order should be lifted.  (ECF No. 79, PageID.802).

Defendant Harvey argues that because Plaintiffs completed construction of the mini-cabins without first obtaining building permits they did not "secure any protected property rights in the building of their cabins."  (ECF No. 85, PageID.1269; ECF No. 101, PageID.2484).  Thus, Plaintiffs "have no property interest in the building of their

cabins, and therefore, cannot assert a procedural due process claim against Harvey for the issuance of the Stop Work Order." (ECF No. 85, PageID.1269; ECF No. 101, PageID.2484). In the alternative, even if Plaintiffs obtained a vested property interest, the Stop Work Order did not deprive them of their rights as construction of the cabins was complete at the time the order was issued and the only reason the Stop Work Order remains in place is because, although Plaintiffs have applied for the required permits and the Building Department has approved them, Plaintiffs refuse to pay for the permits. (ECF No. 85, PageID.1270). Last, Defendant Harvey argues that Plaintiffs cannot prevail on their procedural due process claim because the Stop Work Order provided sufficient notice under the Constitution. (ECF No. 85, PageID.1271). For those reasons, they submit Plaintiffs' procedural due process claim fails as a matter of law and summary judgment on Count I should be granted in Defendant Harvey's favor. (ECF No. 85, PageID.1269).

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. IV. Accordingly, a state official violates a person's right to procedural due process if (1) the state official deprives the person of a protected property interest and (2) the state official denies the person sufficient process. *Id.*; *see Harris v. Caruso*, 465 F. App'x 481, 484 (6th Cir. 2012). Before the undersigned can address whether Plaintiffs' procedural due process rights were violated, we must determine whether Plaintiffs had in fact acquired

14

a vested property interest based on the alleged verbal clearance granted by Defendant Harvey.

It is worth taking a moment to note the difference between the process of obtaining a permit from Alcona County versus the process of obtaining "verbal clearance" as undertaken by Plaintiffs in this case.  Based on the evidentiary record and viewing the facts in favor of the nonmovant, the undersigned will posit Plaintiff Michael Mockeridge and his son, Brian Mockeridge, communicated with the Alcona County Building Department by telephone and confirmed that "no permits were required because the mini-cabins were each 200 square feet or less" and nothing more.  (ECF No. 79-2).  In Alcona County, when seeking a building permit an individual must submit a completed application containing details of the project (e.g., building type, location, etc.).  *See* Alcona County – Building Department, 2023 Application for Building Permit, https://alconacountymi.com/wp/building-department/ (last accessed on July 25, 2023).[9]  Next, the application is examined and reviewed before being approved or denied.  This comparison demonstrates that the process undertaken to obtain verbal clearance falls far short of the process an individual is required to undertake to obtain a building permit in Alcona County.  Thus, a verbal clearance over the phone based on the representations of an individual cannot be afforded the same benefits and protections as

---

[9] The undersigned recognizes that the application located on Alcona County's website may have been revised and/or updated since June 2021.

15

those afforded to individuals who receive a building permit as the result of approval of a written application.  Frankly, an individual with verbal clearance should not be afforded the same credence and protection in comparison to that afforded to a permit holder. The case law, as discussed below[10], and commonsense does not support a finding that verbal clearance received as a result of a telephone conversation is analogous to, and should be afforded the same vested property right, as actually going through the process of obtaining a building permit.  Obtaining a building permit is a more entailed and arduous process which is why courts are inclined to grant and protect a party's vested right based on its issuance along with the presence of substantial construction.

Plaintiffs rely on *Schubiner v. West Bloomfield Township* to support their position that "legal clearance" is the functional equivalent of a permit.  133 Mich. App. 490 (Mich. Ct. App. 1984).  In *Schubiner*, plaintiff submitted a site plan to the township planning commission for approval.  *Id.* at 492.  The commission subsequently conditionally approved the site plan and plaintiff undertook a number of measures to begin constructing the office building (e.g., authorizing their architects to conduct architectural surveys, removing a residential home situated on the property, demolishing an out-building, etc.).  *Id.* at 492.  Approximately one year later, plaintiff requested his site plan be renewed but, after the planning commission met and voted on the request, was ultimately denied because of a recently amended zoning ordinance.  *Id.* at 493–94.

---

[10] *Infra* p. 16–17.

The Michigan Court of Appeals upheld the lower court's finding that plaintiff's rights had not vested because plaintiff had neither obtained a building permit nor commenced "[a]ctual construction." *Id.* at 501.

Plaintiffs' reliance on *Schubiner* to support their position that "'legal clearance' is the functional equivalent of a permit—i.e. authorization to proceed" is misplaced. (ECF No. 98, PageID.2439).  In fact, the language of the *Schubiner* opinion undermines this position.  In *Schubiner*, the court held that an approved site plan was not the equivalent of a building permit and without receipt of such plaintiff did not have "vested rights." 133 Mich. App. at 501.  If controlling Michigan law does not consider a site plan the equivalent of a building permit, it is even less likely that verbal clearance alone would be considered the equivalent of a permit.  The key to vested rights is both substantial construction and the granting of an actual **permit**.  *See Seguin v. City of Sterling Heights*, 968 F.2d 584 (6th Cir. 1992) ("[T]he Michigan courts have continually reaffirmed that a *building permit* and some substantial construction must have commenced before property rights can vest.") (emphasis added).  Absent a building permit, controlling jurisprudence dictates that a party cannot have a vested right. *Schubiner*, 133 Mich. App. at 495–99 (collecting cases).  Thus, the undersigned **RECOMMENDS** the Court find that Plaintiffs did not have a vested right as they were not issued a building permit.

Since Plaintiffs have not established the presence of a protected liberty interest it is not necessary for the undersigned to address the second prong of the test as to

whether the state official denied Plaintiffs sufficient process.  Therefore, the

undersigned **RECOMMENDS** Plaintiffs' Count I – Procedural Due Process Violation

claim be **DISMISSED** (ECF No. 79) as to Defendant Harvey.  Further, Defendant

Harvey's Motion for Summary Judgment as to Plaintiffs' Count I – Procedural Due

Process Violation should be **GRANTED** (ECF No. 85).

### 2.  Count II – Equitable Estoppel/ Vested Rights Claim

Plaintiffs argue that the verbal clearance they received from Defendant Harvey

and the substantial construction undertaken on the property bestowed upon them vested

property rights.  (ECF No. 79, PageID.794–95; ECF No. 98, PageID.2439).  They argue

that individuals who receive a valid permit prior to a subsequent change to an ordinance

"would not necessarily presume that the new ordinance applied to [them]."[11]  (ECF No.

79, PageID.795).  Based on this logic, Plaintiffs argue that just because a government

official later changes their mind as to whether a person has clearance does not mean that

that party loses their vested right.  (ECF No. 79, PageID.795–96).  Plaintiffs argue that

similar to *Dingman Advertising v. Algoma Twp*, 393 Mich. 89 (1974), their reliance on

Alcona County Building Department's legal clearance, in addition to the substantial

construction work completed, resulted in "'a conclusion that valid vesting

nonconforming use exists in favor of the' property owners in [the] form of a ripened

---

[11] This argument is based on the premise that verbal clearance is the equivalent of receiving a permit which the undersigned addressed in Section D(I)(1).  *See supra* p. 15–16.

vested right." (ECF No. 79, PageID.796). Thus, Plaintiffs argue summary judgment is warranted, there is no need for permits, and the Stop Work order should be ordered a nullity or lifted. (ECF No. 79, PageID.796).[12]

In the alternative, Plaintiffs implore the Court to consider utilizing an equitable estoppel theory to find that they have obtained vested property rights. (ECF No. 79, PageID.797). "Equitable estoppel arises when: (1) a party, by representation, admission, or silence, intentionally or negligently induces another party to believe alleged facts, (2) the other party justifiably relies and acts on this belief, and (3) the other party will be prejudiced if the first party is permitted to deny the existence of those alleged facts." *Kalkman*, 2012 WL 4215834 at *4 (citing *AFSCME Int'l Union v. Bank One, NA*, 267 Mich. App. 281, 293, 705 N.W.2d 355 (2005) (quotation marks and citation omitted)). To support their position they rely on *Pittsfield Twp. v. Malcolm*, 375 Mich. 135, 148 (Mich. 1965) and *Kalkman v. City of Douglas*, No. 306051, 2012 WL 4215834 (Mich. Ct. App. 2012).

In *Pittsfield Township.*, the Court held that compelling reasons (i.e., notice of the construction of the kennel given by newspaper, building permit awarded and posted on site, and defendants expenditure of $45,000 constructing the location) were present to support refusing to grant the township's request to enjoin kennel building owner from continuing to use the building as a kennel as "[t]o do otherwise would be contrary to

---

[12] The undersigned will not venture to readdress the vested rights argument as it has already been discussed above. *See supra* Section C(I)(1).

19

equity and good conscience." 375 Mich. at 148. *Kalkman* involved similar facts. In

*Kalkman*, landowner obtained approval for a building permit to construct a residential

home on his property but was then ordered to stop the construction because he

purportedly violated the city's zoning ordinances governing front yard setbacks. 2012

WL 4215834, at *1. The Court upheld the trial court's ruling that the "City [was]

equitably estopped from interfering with Kalkman's construction" because by "issuing

Kalkman a building permit, the City induced Kalkman to believe that he was permitted

to construct the proposed residence, and Kalkman changed his position in reliance on

that permit to the extent that he would be prejudiced if the City were now permitted to

revoke it." *Id.* at *4. Plaintiffs argue that this court should follow *Pittsfield* and

*Kalkman* and find in Plaintiffs' favor on Count II (Equitable Estoppel/ Vested Rights

Claim).

Defendant Harvey argues that equitable estoppel is not appropriate here. First, he

denies advising Plaintiff Michael Mockeridge, or his son, that permits were not required

if the cabins were intended to be used as sleeping quarters. (ECF No. 83, PageID.1035;

ECF 83-3, PageID.1178; ECF No. 83-7, PageID.1247; ECF No. 103, PageID.2695). He

argues his position is supported by Michael Mockeridge's admission during his

deposition that he did not speak to Defendant Harvey until June 2022, which is after the

cabins were constructed, and thus Mr. Mockeridge could not have relied upon

Defendant Harvey's representations that permits were not required. (ECF No. 85,

PageID.1272). Thus, he contends Plaintiffs' vested rights and equitable estoppel claims

are both barred. (*See id.*). Further, he argues Plaintiffs' equitable estoppel claim should be dismissed as it is not a cognizable affirmative claim under Michigan state law. (*See id.*).

The undersigned agrees with Defendant Harvey's request that Plaintiffs' equitable estoppel claim be dismissed on the basis that equitable stoppable is not a cause of action. *Hoye v. Westfield Ins. Co.*, 194 Mich. App. 696, 700–01 (Mich. 1992). Although, some courts in this jurisdiction "have apparently allowed plaintiffs to avail themselves of the doctrine" it is not a cognizable cause of action. *Id.* at 705–06. Controlling jurisprudence holds that while "equitable estoppel is a doctrine that might assist plaintiff[s]; it is not a cause of action and therefore provides no remedy such as damages." *Id.* at 706; *Lathrup Investment Co. v. West American Ins. Co*, 2000 WL 33391105, at *1 (equitable estoppel claim "was properly dismissed by the trial court because a plaintiff cannot use the doctrine of equitable estoppel as a cause of action."); *Marreto v. McDonnell Douglas Capital Corp.*, 200 Mich. App. 438, 505 N.W.2d 275 (1993) (holding that plaintiff's claim of equitable estoppel fails because it is not a cause of action in itself); *Tubby's Inc. v. Lasko*, No. 2229542, 2002 WL 31160310, at *2 (Mich. Sept. 27, 2002) ("Equitable estoppel is not an independent cause of action, but instead a doctrine that may assist a party by precluding the opposing party from asserting or denying the existence of a particular fact."). Therefore, the undersigned **RECOMMENDS** Defendant Harvey's summary judgment motion (ECF No. 85) as to Count II - Equitable Estoppel/Vested Rights claim be **GRANTED**.

21

Although Plaintiffs identify equitable estoppel as a cause of action in their amended complaint, it appears their true request is that the Court use the theory to find that they acquired a vested property interest.  Thus, the undersigned will endeavor to address this request.  Despite Plaintiffs' reading of the cases, neither *Kalkman* nor *Pittsfield* support their claim to equitable estoppel as there is one integral factor, which was present in both cases, that is notably missing here — a permit.  In both *Kalkman* and *Pittsfield* the presence of a permit led the courts in both cases to find against the government.  *Kalkman* notes the importance of a permit in the decision when it explains that "a permit is an *official document* authorizing its holders to proceed with the proposed project." *Id.* at *4 (emphasis added).  To receive the permit, the kennel building owner in *Kalkman* submitted an application to the zoning administrator which was approved after the administrator consulted with the City of Village of Douglas's attorney. *Id* at *4.  Next, the kennel building owner submitted his application for a building permit and plan to the authority responsible for issuing the City's building permits. *Id.* at *4.  Based on the process as outlined in *Kalkman*, obtaining verbal clearance is in no manner analogous to obtaining a permit.  The latter involves a much more detailed and involved process.  More importantly, a permit is an official document granted to an applicant after the government has been afforded the opportunity to review and thoroughly analyze the application.  The facts in the instant action involve nothing more than an alleged brief telephone conversation (i.e., an exchange of words without any submission of documents or opportunity for thorough assessment of said request).

22

However, Plaintiffs lack of a building permit is not the death knell to their request for summary judgment finding that they have a vested property interest under an equitable estoppel claim.  Its true undoing is far simpler — presence of a genuine issue of material fact.  The Court is unable to fully address the request for equitable estoppel as there is a genuine issue of material fact as to whether Defendant Harvey, or any other Alcona County Building Department official, represented to Plaintiffs that a building permit was not necessary for the erection of the mini-cabins.  *Anderson*, 477 U.S. at 248; *Lakey v. Elite Sch. Mgmt.*, No. 17-10425, 2018 WL 3997837, at *3 (E.D. Mich. Aug. 21, 2018) (plaintiff's motion denied in part as genuine issues of material fact existed); *Boyer v. Home Depot U.S.A., Inc.*, No. 08-13382, 2009 WL 3429749, at *5 (E.D. Mich. Oct. 21, 2009) (denying defendant's motion for summary judgment as genuine issues of material fact existed).  Further, there is also a genuine issue of material fact as to whether Plaintiffs' reliance on the alleged verbal confirmation over the phone was even justifiable.  *Kalkman*, 2012 WL 4215834 at *4.

Thus because the evidentiary record is not clear as to what type of verbal clearance, if any, was provided to Plaintiffs, or their agents (i.e., Plaintiffs' adult children), by Alcona County Building Department officials, Plaintiffs' request for summary judgment should be denied.  Therefore, the undersigned **RECOMMENDS** Plaintiffs' summary judgment motion (ECF No. 79) as to their Count II - Equitable Estoppel/Vested Rights claim be **DENIED**.

23

### 3. Count III – Fourth Amendment Constitutional Violation

Plaintiffs argue that by entering their property, without permission or a warrant, to inspect the mini-cabins and surrounding area Defendants Harvey and Schmidt, in their personal capacities, violated Plaintiffs' Fourth Amendment rights.[13]  (ECF No. 79, PageID.790).  In sum, the parties present three potential scenarios under which the mini-cabins may be categorized in relation to the Fourth Amendment: (i) the mini-cabins and surrounding area fall within the curtilage of the House; (ii) the mini-cabins are homes under the Fourth Amendment and the surrounding area qualifies as their curtilage; or (iii) the mini-cabins are located within the "open fields" of Plaintiffs' property.[14]

---

[13] Plaintiffs only seek summary judgment on liability and request that the issue of damages be left for trial.  (ECF No. 79, PageID.791).

[14] Defendants Harvey and Schmidt argue that Plaintiffs have failed to establish that the visit took place in a constitutionally protected area.  (ECF No. 85, PageID.1273; ECF No. 101, PageID.2478).  They explain that under the *Dunn* factors, the mini-cabins qualify as open fields because (i) they are not located within close proximity to Plaintiffs' home (ECF No. 85, PageID.1275); (ii) there is no fencing enclosing Plaintiffs' home along with the mini-cabins (*id.* at PageID.1276); (iii) the mini-cabins are not, and cannot, be used to conduct the majority of their daily activities (*id.* at PageID.1276–77); and (iv) Plaintiffs have not taken measures to prevent the cabins from being seen by others (*id.* at PageID.1277).  Thus, the cabins and the surrounding area fall within the "open fields of the Mockeridges' property" and are not protected by the Fourth Amendment.  (*Id.* at PageID.1273; ECF No. 101, PageID.2479).

Plaintiffs respond that based on their interpretation of the *Dunn* factors "the curtilage includes all that is within the developed/maintained portion of Skylar Trail Property."  (ECF No. 98, PageID.2431).  They argue that Defendant Harvey took the impermissible intrusion a step further by "approaching and looking through the windows of the mini-cabins."  (*Id.* at PageID.2428).  And argue the photograph of Defendant Schmidt standing behind one of the mini-cabins inspecting the structure and his contradictory deposition testimony that he did not go behind the building creates a material question of fact for the jury to decide that should not permit Defendants Harvey and Schmidt's motion to be granted.  (*Id.* at PageID.2429).

Defendants Harvey and Schmidt respond that Plaintiffs fail to explain why the mini-cabins "should be treated as five separate homes with curtilages, as opposed to the more

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause," and grants individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Based on this constitutional text, the Court has repeatedly held that 'searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Williams Huron Gardens 397 Trust v. Twp. of Waterford*, No. 18-12319, 2019 WL 2051967, at *7 (E.D. Mich. Feb. 28, 2019) (citations omitted). "A search is defined in terms of a person's 'reasonable expectation of privacy'' and analyzed under a two-part test: (i) "has the individual manifested a subjective expectation of privacy in the object of the challenged search?" and (ii) "is society willing to recognize that expectation as reasonable?" *Widgren v. Maple Grove Twp.*, 429 F.3d 575, 578 (6th Cir. 2005) (citing *California v. Ciraolo*, 476 U.S. 207, 211 (1986)). Searches which serve a "special need" other than conducting criminal investigations" are referred to as "administrative searches." *See id.* (citations omitted).

Before addressing whether Plaintiffs' Fourth Amendment constitutional rights were violated, the undersigned must determine whether the area at issue is protected

---

reasonable conclusion that the pre-existing house on the property (the "House") and its curtilage, which does not include the mini-cabins and the surrounding area, are the only constitutionally protected areas of the Property." (ECF No. 112, pageID.2779).

under the amendment.  *United States v. Dunn*, 480 U.S. 294 (1987) is instructive on this

point as it provides guidance for determining what constitutes curtilage:

> [In *Oliver v. United States*, 466 U.S. 170, 104 S. Ct. 1735, 80
> L.Ed.2d 214 (1984)], we recognized that the Fourth
> Amendment protects the curtilage of a house and that the extent
> of the curtilage is determined by factors that bear upon whether
> an individual reasonably may expect that the area in question
> should be treated as the home itself. **We identified the central
> component of this inquiry as whether the area harbors the
> intimate activity associated with the sanctity of a man's
> home and the privacies of life**.
>
> Drawing upon the Court's own cases and the cumulative
> experience of the lower courts that have grappled with the task
> of defining the extent of a home's curtilage, we believe that
> curtilage questions should be resolved with particular reference
> to four factors: the proximity of the area claimed to be curtilage
> to the home, whether the area is included within an enclosure
> surrounding the home, the nature of the uses to which the area
> is put, and the steps taken by the resident to protect the area
> from observation by people passing by.

*Id.* at 299 (internal citations and quotations marks omitted) (emphasis added).  The

Court cautioned against an overly rigid application of the *Dunn* factors and advised that

the significant query is "*whether the area in question is so intimately tied to the home*

*itself* that it should be placed under the home's 'umbrella' of the Fourth Amendment

protection." *Id.* at 301 (emphasis added).  Further, the Fourth Amendment protection

afforded curtilage is not just to protect the area immediately surrounding the home but

"essentially a protection of families and personal privacy in an area intimately linked to

the home, both physically and psychologically, where privacy expectations are most

heightened." *California v. Ciraolo*, 476 U.S. 207, 212–13 (1986).

26

The question of which of the potential scenarios, as proffered by the parties, the mini-cabins fall under in relation to the Fourth Amendment is a close one based on the multifactor *Dunn* test. Under a wholistic review of the *Dunn* factors, the undersigned finds that the facts of this case weigh in favor of finding that the mini-cabins fall within the curtilage of the House.

**Proximity**: Standing in isolation, the fact that the mini-cabins are located between 80 to 90 feet from the House may warrant finding that they do not fall within the curtilage of the House. *See Dunn*, 489 U.S. at 302 (noting that the substantial distance of the barn located 60 yards from the house itself "supports no inference that the barn should be treated as an adjunct of the house."). However, controlling jurisprudence demonstrates that significant distance between a home and an auxiliary structure does not automatically disqualify said structure from being found to fall within the curtilage of the home. *See e.g., U.S. v. Bennett*, 170 F.3d 632, 639 (6th Cir. 1999) (noting search warrant covered shop building, located between 60 to100 feet away from the residence, still considered to fall within the curtilage of the property); *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 598–99 (6th Cir. 1998) ("There is not . . . any fixed distance at which curtilage ends.") (citing *United States v. Depew*, 8 F.3d 1424 (9th Cir. 1993)); *Bollini v. Bolden*, No. 08-14608, 2010 WL 1494562, at *3 (E.D. Mich. Apr. 14, 2010) (finding that the proximity of the detached pole barn, located approximately 20 yards from the principal residence, "weigh[ed] in favor of finding the pole barn to be within the home's curtilage"). As the case law demonstrates, the

27

distance at which the mini-cabins are located from the House can be used to both support and deny a finding that they fall within the curtilage of Plaintiffs' Home.

**Fencing/Protection**: As to factor two, although the mini-cabins are not surrounded by a fence or any other type of barrier that would demonstrate or communicate to a passerby that the "mini-cabins" are "included within an enclosure," they are surrounded by woods which may be viewed as serving as a natural boundary outlining the parameters of their home. *See Bollini*, 2010 WL 1494562 at *3; *see also Williams v. Garrett*, 722 F. Supp. 254 (W.D. Va. 1989) (finding the "boxwood hedge and the heavy woods created a natural enclosure around the home and yard. . . ."). Again, as Plaintiffs and Defendants Harvey and Schmidt's briefing demonstrate, the absence of fencing but the presence of a natural boundary is not decisive enough to either support or deny a finding that the mini-cabins fall within the curtilage of the House.

**Purpose**: The instruction provided by the Supreme Court not to engage in an overly rigid application of the *Dunn* factors, but instead to keep at the forefront of the analysis the significant query as to "*whether the area in question is so intimately tied to the home itself* that it should be placed under the home's 'umbrella' of the Fourth Amendment protection" is significant. *Id.* at 301. Plaintiffs describe the mini-cabins as "sleeping quarters[15] for family members" that is also used for cabining, recreating, and

---

[15] The undersigned notes that Plaintiffs categorize the mini-cabins as merely accessory structures when they argue they relied upon Defendant Harvey's representations regarding not

outdoor enjoyment (similar to the activities of a backyard).  (ECF No. 79, PageID.778–79; ECF No. 83, PageID.1033; ECF No. 91, PageID.2253).

The fact that the mini-cabins are used as "sleeping quarters" (i.e., for limited human habitation) as opposed to sheds to store tools or additional equipment weighs in favor of finding that the activities of home life extend to the area in question.  If the mini-cabins were used as merely kitchen units, parlors, or sitting rooms it is possible the analysis would be different.  However, because the mini-cabins are used as sleeping quarters their purpose is directly related to the Plaintiffs' home.

Further, while the undersigned notes that at the time of site visit the area was unoccupied this is not persuasive enough as parties are entitled to protection of their home even while they are away.  *U.S. v. Biles*, 100 F. App'x 484, 493 (6th Cir. 2004) (defendant's shop, located approximately 150 feet behind main residence, which was occasionally used as a residence fell within the curtilage of the home and therefore was subject to the warrant); *Taylor v. Humphries*, 402 F. Supp. 2d 840 (845) (W.D. Mich. 2005) (Fourth Amendment protection afforded recreational cabin).  Further, the

---

needing a permit, and in the same breath categorize the mini-cabins as more than an accessory structure when seeking protection under the Fourth Amendment.  (ECF No. 91, PageID.2250 ("[T]he area actually inspected (i.e. searched) by Harvey was not in or on an open field, but within a developed portion of residentially-developed property with modern amenities containing six cabins.  It contains cabins, planted lawn grass, and other indicia of residential dwelling.  The area immediately surrounding and associated with a house—known as its "curtilage"—has Fourth Amendment protections.") (internal citations omitted)).  The undersigned notes that the simultaneous use of these two "definitions" of the mini-cabins are a bit self-serving.

Government Officials were informed that it appeared the mini-cabins were being used to build a campground and thus on notice prior to entering Plaintiffs' property that there was a possibility the mini-cabins were being used for people to stay in. During the site visit, the purpose of the mini-cabins was communicated to the Government Officials by the presence of the bed and bunk inside the structures. (ECF No. 85-8, PageID.1636).

The nature of the use of the mini-cabin significantly weighs in favor of finding that the mini-cabins fall within the curtilage of the House.

**Protection from Observation**: Finally, the undersigned finds that the area was protected from observation as it was (i) surrounded on all sides by wooded forest, (ii) not visible from a public road, and (iii) located in a remote area. (ECF No. 80, PageID.929; ECF No. 85-8, PageID.1642; ECF No. 85-10, PageID.1705; ECF No. 91, PageID.2253). Based on the record, Plaintiffs implemented reasonable and sufficient measures to ensure that the mini-cabins were protected from observation by the general public.

First, Plaintiffs deliberately placed the mini-cabins in a location where they were "enclosed on all sides by wooded forest. . . ." (ECF No. 91, PageID.2253); *see Bollini*, 2010 WL 1494562 at *3 ("Plaintiff's home and the pole barn are both surrounded by same thick common woods which serve as a natural boundary defining the area of the home."). Second, the mini-cabins cannot be viewed from a public road. (ECF No. 85-8, PageID.1642). Third, the mini-cabins were placed in a rural location where they were protected from being viewed by passersby. This is underscored by Defendant

30

Schmidt's own representation as to Defendant Krentz's purpose for accompanying the Government Officials to show them where the site was located as it was apparently difficult to locate using GPS despite the directions included on the complaint forms.

> Q. And how was it that Mr. Krentz came to be present during that visit?
>
> A. He offered to take us in to show us the - - because of the **remoteness** of the property where - - what he was observing.

(ECF No. 85-10, PageID.1705).

Further, although the mini-cabins could be viewed by Defendants while they were standing near the property line on the Miller Property, this type of viewing cannot be the kind the Supreme Court envisioned or considered when they outlined the *Dunn* factors. (ECF No. 85-8, PageID.1655; ECF No. 85-9, PageID.1685; ECF No. 85-10, PageID.1708). If this rationale were accepted, this factor would automatically cut against all individuals who live in urban communities where they do not enjoy the luxury of having yards or acres of space available to separate them from their neighbors. Thus, the undersigned finds that the mini-cabins were located within the curtilage of the House. As the mini-cabins fall within the curtilage of the main home, there is no need for the undersigned to address the remaining two proffered theories (i.e., the mini-cabins are homes under the Fourth Amendment or the mini-cabins are located within the open fields of the property).

Next, we must consider whether Defendants Harvey and Schmidt's actions of conducting a site visit without Plaintiffs' permission or a warrant constituted a constitutional violation and, if so, are they entitled to qualified immunity.

### 4. Qualified Immunity

Defendants Harvey and Schmidt argue that Plaintiffs' partial summary judgment motion should be denied, and their respective summary judgment motion granted, as Plaintiffs failed to overcome their qualified immunity defense.  (ECF No. 85, PageID.1278; ECF No. 101, PageID.2485).  Defendants Harvey and Schmidt argue that neither violated Plaintiffs' Fourth Amendment rights by their actions of observing the mini-cabins from the property's open fields and Plaintiffs' alleged Fourth Amendment protection surrounding the mini-cabins is not a "clearly established" right.  (ECF No. 85, PageID.1279; ECF No. 101, PageID.2486).  Even if the mini-cabins were entitled to Fourth Amendment protection, Defendants Harvey and Schmidt argue that they are entitled to qualified immunity.  In response to the motion, Plaintiffs rely upon *Morgan v. Fairfield County* to establish that Defendants Harvey and Schmidt were near the mini-cabins, which Plaintiffs proffer should be characterized as "homes," and simultaneously within the curtilage while conducting their administrative search.  903 F.3d 553, 561 (6th Cir. 2018); (ECF No. 104, PageID.2717).

As the undersigned finds that the mini-cabins fall within the curtilage of the House, the only argument left to address is whether Defendants Harvey and Schmidt are entitled to qualified immunity.

32

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To assert a violation of a clearly established right and defeat a qualified immunity defense, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "Put another way, a state official sued in his individual capacity, such as [defendant] performing a discretionary function is 'shield[ed] . . . from civil damages liability as long as [his] actions could reasonably have been thought consistent with the rights [he is] alleged to have violated.'" *Taylor*, 402 F. Supp. 2d at 844 (citing *Myers v. Potter*, 422 F.3d 347, 352 (6th Cir. 2005)).  "The Sixth Circuit instructs that whether an officer would understand that what he is doing violates an individual's right is measured objectively and can be decided as a matter of law." *Hardesty v. Hamburg Twp., et al.*, 352 F. Supp. 823, 830 (2005) (citing *Brandenburg v. Cuerton*, 882 F.2d 211, 215 (6th Cir. 1989)).

The qualified immunity test comprises of a two-step analysis: (i) the court must assess, in the light most favorable to the plaintiff, "do the facts alleged show the officer's conduct violated a constitutional right," and next (ii) "if so, was that right clearly established." *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001).  First, I will determine whether Defendants Harvey and Schmidt's conduct violated Plaintiffs'

33

Fourth Amendment constitutional right.  As discussed above, the Fourth Amendment

provides the "right of the people to be secure in their persons, houses, papers, and

effects, against unreasonable searches and seizures, shall not be violated . . . ."  *Taylor*,

402 F. Supp. 2d at 845.  The protections granted under the Fourth Amendment are

triggered only when a search occurs.  *See id.*

> A search is defined in terms of whether a person has a
> constitutionally protected reasonable expectation of privacy.
> A reasonable expectation of privacy is analyzed under a two
> part test: (1) has the individual manifested a subjective
> expectation of privacy in the object of the challenged search
> and (2) is society willing to recognize that expectation as
> reasonable.

*See id.*  (internal citations and quotations marks omitted).

Based on the evidentiary record, Plaintiffs' actions demonstrate they manifested a

subjective expectation of privacy in the mini-cabins.  Although the mini-cabins were

visible from the Miller Property, this alone does not cut against Plaintiffs' subjective

expectation of privacy.  The fact that the mini-cabins were surrounded by trees, placed

in a remote area, and not visible from a public road all demonstrate an expectation of

privacy.  (ECF No. 85-8, PageID.1642; ECF No. 85-10, PageID.1705; ECF No. 91,

pageID.2253); *Taylor*, 402 F. Supp. 2d 840, 845 (plaintiff "clearly manifested a

subjective expectation of privacy in the interior of his home" as the home was placed in

a remote area and not visible from any public area).

The second prong which asks whether society is willing to recognize this

expectation as reasonable focuses on two considerations: (i) what the individual had an

expectation of privacy in (e.g., a home, office, etc.) and (ii) what the individual wanted to protect their privacy from (e.g., non-family members, non-employees of a firm, etc.). *Taylor*, 402 F. Supp. 2d at 845.  In this case, the facts demonstrate Plaintiffs had an expectation of privacy in the mini-cabins, which were slated to be sleeping quarters for the family members, and this is the type of location that society would find a person has a reasonable expectation of privacy.  *See id.* at 845 (The question as to whether society is willing to recognize a party's expectation of privacy as reasonable "centers on" whether the human relationships that normally exist at the place inspected are based on intimacy, confidentiality, trust or solicitude and hence give rise to a 'reasonable' expectation of privacy) (citing *Dow Chemical Co. v. United States*, 749 F.2d 307, 312 (6th Cir. 1984)).  Plaintiffs' expectation of privacy in the mini-cabins and the surrounding area is the type that society would recognize as reasonable.  Thus, Plaintiffs had a constitutionally protected reasonable expectation of privacy and this expectation implicates the core of the Fourth Amendment's protection.  *Taylor*, 402 F. Supp. 2d at 846.

So, the inquiry now turns to what, or whom, Plaintiffs wanted to protect their privacy from and thus the focus is on the government intrusion performed by Defendants Harvey and Schmidt.  The Fourth Amendment does not absolutely bar all governmental intrusions onto someone's curtilage.  *Widgren v. Maple Grove Twp.*, 429 F.3d 575, 582 (6th Cir. 2005).  "Assessing the degree of intrusion requires addressing both the *methods used* and the *purpose for the intrusion*."  *Taylor*, 402 F. Supp. 2d at

846 (internal citations and quotations omitted); *see also Widgren*, 429 F.3d at 583.

Measures which require an officer to contort their body in order to make an observation

(e.g., crane their neck, squat or bend over) are typically considered more intrusive than

those a "reasonably curious neighbor" might undertake. *Widgren*, 429 F.3d at 583 (6th

Cir. 2005) (citing *James v. United States*, 418 F.2d 1150, 1151 n.1 (D.C. Cir. 1969)).

While not necessarily determinative, entering the curtilage is also relevant when

assessing the degree of government intrusion. *Id.* at 582 (citing *Oliver v. United States*,

466 U.S. 170, 183 (1984)). Thus, the pivotal question is what degree of intrusion was

used once Defendants Harvey and Schmidt crossed over the property line.

   *Taylor* is instructive on this issue and provides guidance as to how courts should

approach the issue.  Under the test outlined in *Taylor*, during the site visit Defendants

Harvey and Schmidt used the least intrusive methods when inspecting the mini-cabins

and surrounding area which did not amount to a constitutional violation.  Defendant

Harvey did not crane or distort his body to look inside the cabins.  Nor did he disturb the

blinds that were located on some of the cabin windows.  (ECF No. 85-8, PageID.1651).

He used nothing more than his naked eye and a small flashlight to look within the mini-

cabins.  (ECF No. 85-8, PageID.1655).  Similar actions were taken by Defendant

Schmidt.  While he did step onto the porch of one structure, he did so to knock on the

door to see if anyone was home.  (ECF No. 85-10, PageID.1700).  He did not use an

extraordinary measure to survey the house or enter the mini-cabin; he limited his range

of investigation to the area surrounding the mini-cabin.  (ECF No. 85-10, PageID.1699–

70).  Further the inspection was done during the day, limited in scope, and not similar to

that of a criminal police investigation.  Under these facts, the undersigned finds that

Defendants Harvey and Schmidt actions involved the smallest degree of intrusion.

Next, we examine Defendants Harvey and Schmidt's purposes for entering the

property.  They entered the property to observe and follow up on the complaints that

were filed regarding the alleged unlawful development of an "unlicensed campground"

and "sanitation issue."  (ECF No. 79, PageID.781; ECF No. 79-9, PageID.821).  Upon

their initial arrival, they remained on the Miller Property while surveying the mini-

cabins to assess if potential issues were present.  The parties are not sure who walked

over the property line first but what the record does establish is that Defendant Gibson

noted a potential issue with the setback of one of the cabins and Defendant Harvey

noticed electrical wiring on a few of the mini-cabins.  (ECF No. 85, PageID.1264; ECF

No.85-9, PageID.1686; ECF No. 102, PageID.2500; ECF No. 85-10, PageID.1695,

1701).  Defendants Harvey and Schmidt crossed over after they noted the issues to take

a closer look at the potential concerns.  Their purpose in crossing over was to

investigate the complaints they received and upon entering the property, Defendant

Schmidt attempted to contact someone before reviewing the area. Their purpose while

on the property was not to conduct a criminal investigation and falls more in line with

an administrative search. *Taylor*, 402 F. Supp. 2d at 847; *Widgren*, 429 F.3d at 583

(holding that property tax assessor did not conduct a search by conducting an

administrative inspection of the exterior of a home for the purpose of tax assessment)

Considering the minor intrusion conducted by Defendants Harvey and Schmidt, the methods they used and the purpose for their presence on the property, the undersigned does not find that Defendants Harvey and Schmidt performed a search which would trigger a Fourth Amendment constitutional violation.

Even if, Defendants Harvey and Schmidt's intrusion onto the property was found to be a constitutional violation, they would both be entitled to a qualified immunity defense.  It is reasonable that the local health inspector and building inspector, who received complaints and noticed additional potentially dangerous issues, would not appreciate at the time of the site visit that their brief intrusion onto an individual's property to further investigate the complaints would violate the Constitution.[16]  *Taylor*, 402 F. Supp. 2d at 850 (finding conservation officer would conducted a "brief property

---

[16] Please note the undersigned does not condone the actions conducted by Defendants Harvey and Schmidt and supports the type of measures implemented by the District Health Department No. 2 of encouraging government officials to conduct inspections either with the permission of the property owner or a warrant.

> Q. As a result of this lawsuit, has your department changed the way it operates as it applies to obtaining warrants for – to conduct inspections without permission from the property owners.
> [ . . . ]

> A. It has been – as a result of this reminders have been put out that we must follow the, you know, like I stated before, go to the front door, they to make contact, and that we don't go in the backyards or anything without permission, you know, walk around the house or into locked gates, which never did here, which I don't do.  It was just basically a reminder to staff.

(ECF No. 85-10, PageID.1705).

check for purpose of insuring the security of a home" would not understand that this constituted a constitutional violation).

### 5. Trespass Claim

The undersigned **RECOMMENDS** Plaintiffs' state law trespass claim be **DISMISSED without prejudice**. When a plaintiff's federal claims have been dismissed on the merits, the question of whether to retain jurisdiction over any state law claims rests within the court's discretion. *Blakely v. United States*, 276 F.3d 853, 860 (6th Cir. 2002). Under § 1367(c)(3), the Court may decline to exercise supplemental jurisdiction over the remaining state law claims. *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims."). In the instant action, there is no compelling reason to retain supplemental jurisdiction over Plaintiffs' state law trespass claim and thus, the undersigned recommends that it be dismissed without prejudice. Plaintiffs are not prohibited from bringing state law claim in state court.

## II. Defendant Krentz's Motion for Partial Summary Judgment (ECF No. 80)

### 1. Civil Conspiracy

To allege a § 1983 claim "for conspiracy to deprive [a plaintiff] of their due process rights," a plaintiff must show three things: 1) there was a common plan; 2) the conspirators shared an objective to deprive the plaintiff of their constitutional rights; and

3) the plaintiff's injury was caused by an overt act committed in furtherance of the

conspiracy. *Jackson v. City of Cleveland*, 925 F.3d 793, 817 (6th Cir. 2019).

Additionally, a plaintiff must demonstrate that the conspirators are not members "of the

same collective entity," but rather that they are "[at least] two separate 'people' [capable

of forming] a conspiracy." *See id.*

Plaintiffs' response to Defendant Krentz's motion exhibits nothing more than a

hodgepodge of unsupported allegations as outlined below:

- The First Amended Complaint alleges Krentz was part of a conspiracy

  that included "the <u>preparation</u> *and* <u>execution</u> of an unlawful, illegal, and

  warrantless search" of the Skylar Trail Property.  Specifically

  > Defendant KEITH KRENTZ helped prepare and execute a plan for
  > which he and Defendants HARRY HARVEY, KENNETH GIBSON,
  > DAVID SCHMIDT, TOWNSHIP OF CALEDONIA, and COUNTY
  > OF ALCONA had the conspiratorial objective to illegally,
  > unconstitutionally, and warrantlessly enter the Skylar Trail Property
  > on June 2, 2021 without the knowledge or consent of Plaintiffs
  > MICHAEL J. MOCKERIDGE and SUSAN J. MOCKERIDGE in
  > violation of the Fourth Amendment.

  > Once on the property – Defendant KEITH KRENTZ assisted, aided,
  > cooperated, and helped facilitate Defendants HARRY HARVEY,
  > KENNETH GIBSON, and DAVID SCHMIDT in the warrantless
  > search of the Skylar Trail Property to gather information for the later
  > benefit of and use by Defendants HARRY HARVEY, KENNETH
  > GIBSON, DAVID SCHMIDT, TOWNSHIP OF CALEDONIA, and
  > COUNTY OF ALCONA.

  > (ECF No. 90, PageID.2158–59) (emphasis in original).

- Count V alleges a conspiracy by and among three government official and
  a private co-conspirator to violate the Fourth Amendment—i.e.

40

undertaking a secret warrantless permissionless search for the purpose of extracting information during the course of a trespass. (*Id.* at PageID.2163–64).

• Here, the evidence establishes that Krentz, Harvey, and Schmidt formed a "consensus" to attempt to destroy the Mockeridges' enjoyment and continued use of the Skylar Trail Property by wrongful and illegal government invasion vis-à-vis the Fourth Amendment. (*Id.* at PageID.2164).

• The answer is that a shared general conspiratorial objective was formed to secretly (i.e. without the permission of the Mockeridges) and warrantlessly enter the Skylar Trial Property to undertake an illegal site-inspection (causing injury to Plaintiffs' privacy rights) to attempt to locate evidence to then permit the various governmental officials to use their government powers to end the Mockeridges' use of the Skylar Trail Property and have the Mockeridges "sent packing." (*Id.* at PageID.2164–65).

• Further, Krentz personally transported Harvey, Gibson, Schmidt, and himself to the backside northern side (which is totally on the other side of the property which the Mockeridges' driveway is) onto his godson's land. From there, Krentz concedes he jointed [sic] the three other government officials by entering the Skylar Trail Property to directly assist in the warrantless permissionless search. (*Id.* at PageID.2166).

• Bottomline, there is both direct and circumstantial evidence confirming the existence of a single plan (i.e. drive the Mockeridges out) together with a shared general conspiratorial objective to secretly use the powers of each governmental officials' office by securing evidence via a warrantless permissionless site inspection arranged and intentionally directed by Krentz to be kept from the knowledge of the Mockeridges. (*Id.*).

The only consistency demonstrated by the allegations outlined above is the lack

evidentiary support.  The only circumstantial "evidence"  Plaintiffs proffer to support

the existence of a civil conspiracy is (i) Defendant Krentz's actions of coordinating and

escorting the Government Officials to the Mockeridge property, (ii) a text message from

Defendant Krentz to Defendant Gibson stating his desire to see Plaintiffs "sent packing," and (iii) a text message from Defendant Krentz to Defendant Schmidt explaining that he does not want the Mockeridges to know Defendant Krentz and the Government Officials were coming.  (ECF No. 79-13, PageID.825, ECF No. 90-2, PageID.2170, ECF No. 90, PageID.2163, n. 18).

Even after analyzing the proffered evidence and viewing the facts in Plaintiffs' favor, the undersigned is unable to locate a shared conspiratorial objective between Defendant Krentz and the Government Officials to violate Plaintiffs' rights.  The Government Officials' actions fall more in line with them completing their duties and not in line with the objective of pursuing some shared conspiracy.  *See Hansley v. Gassman*, 693 F.3d 681, 695 (6th Cir.) (civil conspiracy not established because "there was no evidence of an unlawful agreement" and the officers' conduct was "consistent with independent conduct as it [was] with a conspiracy").

*Wilkerson v. Warner* is instructive as, similar to the instant action, the evidentiary record contained very little evidence to support the existence of an unlawful agreement. 545 F. App'x 413 (6th Cir. 2013).  During a protest, Plaintiff Doctor noticed that a protester who had been handcuffed appeared to have fainted and began to assist him by checking his vitals.  *Id.* at 416–17.  Once Defendant Attending Paramedic arrived, Plaintiff Doctor moved aside and allowed him to begin working on the protestor.  *Id.* at 417.  Plaintiff Doctor began voicing her unsolicited opinions about the treatment being administered to the protestor and Defendant Attending Paramedic requested Defendant

42

Officer remove Plaintiff Doctor from the location. *Id.* at 417. Plaintiff Doctor alleged

that the Defendant Officer and Defendant Attending Paramedic worked in concert

during the incident to keep her from exercising her protected speech. *Id.* at 421. The

Court found "there was scant evidence in the record to support a finding that any

agreement existed between" Defendant Officer and Defendant Attending Paramedic. *Id.*

at 422. In fact, the record supported a finding that Defendant Attending Paramedic's

request that Plaintiff be removed from the area was so that he could continue

administering medical treatment to the protestor without the Plaintiff Doctor's

continued interruptions. *Id.* at 422.

     The same occurs here. Viewing the evidence in the light most favorable to

Plaintiff, there is not sufficient evidence of a joint agreement of the type Plaintiffs

allege. In this case, Plaintiffs have failed to proffer evidence that Defendant Krentz

engaged in a plan with even one of the Government Officials to violate their Fourth

Amendment Constitutional right. The most Plaintiffs demonstrate is that there was a

plan in place for the Government Officials and Defendant Krentz to observe the mini-

cabins. (ECF No. 79, PageID.782; ECF No.79-36, PageID.912; ECF No. 83,

PageID.1036; ECF 85-6, PageID.1615–16). Further the actions taken by Defendant

Krentz of driving on his family property to reach a location where the mini-cabins could

be observed undermines the argument that there was a plan to violate Plaintiffs' Fourth

Amendment rights. (ECF No. 83, PageID.1037; ECF No. 85-6, PageID.1616).

Defendant Krentz's action demonstrate that he was assisting the Government Officials

to investigate the complaints he, and his fellow neighbors, made regarding the development of an allegedly illegal campground and that the Government Officials were visiting the site to follow up on the complaints they received.

Further, because the undersigned finds that a constitutional violation did not take place and, thus there is no viable underlying federal cause of action,  Defendant Krentz cannot be found to be liable for a civil conspiracy claim.  Thus, the undersigned **RECOMMENDS** Defendant Krentz's Partial Motion for Summary Judgment (ECF No. 80) be **GRANTED**.

### III.  Defendant Alcona County's Motion for Summary Judgment (ECF No. 83)

Plaintiffs assert four claims against Defendant Alcona County: Procedural Due Process Violation (Count I), Equitable Estoppel/Vested Rights (Count II), Fourth Amendment Violation (Count III), and Trespass (Count IV).  Defendant Alcona County filed a Motion for Summary Judgment on Plaintiffs' Procedural Due Process Violation (Count I), Equitable Estoppel/Vested Rights (Count II), Fourth Amendment Violation (Count III), and Trespass (Count IV).  (ECF No. 83).

For the reasons discussed above as to Defendant Harvey, the undersigned **RECOMMENDS** Defendant Alcona's motion be **GRANTED** as to Counts I, II, III, and IV.  (ECF No. 83).  Further, the undersigned **RECOMMENDS** Plaintiffs' motion as to Counts I, II, III, and  IV as to Defendant Alcona County be **DENIED**.  (ECF No. 79).

## IV.  Defendants Gibson and Caledonia Township's Motion for Summary Judgment (ECF No. 86)

Plaintiffs assert two claims against Defendants Gibson and Caldenoia Township: Fourth Amendment Violation (Count III) and Trespass (Count IV).–Defendants Kenneth Gibson and Caledonia Township filed a Motion for Summary Judgment on the same counts.  (ECF No. 86).

For the reasons discussed above as to Defendant Schmidt, the undersigned **RECOMMENDS** Defendants Gibson[17] and Caledonia Township's motion be **GRANTED** as to Counts III and IV.  (ECF No. 83).  Further, the undersigned **RECOMMENDS** Plaintiff's motion as to Counts III and IV as to Defendants Gibson and Caledonia Township's be **DENIED**.  (ECF No. 79).

### D. Conclusion

The undersigned **RECOMMENDS** Plaintiff's Motion for Partial Summary Judgment be **DENIED** (ECF No. 79).  Further, the undersigned **RECOMMENDS** Defendants Krentz's (ECF No. 80), Alcona County (ECF No. 83), Harvey and Schmidt (ECF No. 85), and Gibson and Caledonia Township (ECF No. 86) respective dispositive motions be **GRANTED**.  If adopted, the only remaining claim would be the state law trespass claim which the undersigned **RECOMMENDS** the Court decline to exercise supplemental jurisdiction over.

---

[17] The observation measures undertaken by Defendant Gibson during the June 2, 2021 site visit as outlined in Section II(A) were even more restrictive than those undertaken by Defendant Schmidt and thus qualifies as an even smaller governmental intrusion.

45

### III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are

without merit, it may rule without awaiting the response.

Date:  July 26, 2023                    S/ PATRICIA T. MORRIS
                                        Patricia T. Morris
                                        United States Magistrate Judge